ARMSTRONG, Judge.
Plaintiff, the City of New Orleans (the “City”), and intervenors, the St. Charles Avenue and Garden District Associations, appeal from a judgment in favor of defendants, John J. Elms, Jr., Joyce Elms Ben-chabbat, and Jacques Benchabbat, maintaining defendants’ exception of prescription and dismissing plaintiff and inter-venors’ suits to enjoin defendants from operating a party and reception business in a residence located at 3029 St. Charles Avenue in the City of New Orleans.
This case is before us for the second time. The City originally instituted this action in November, 1983, claiming that defendants’ commercial use of the property, hereinafter referred to as the “Elms House,” for parties and receptions was in violation of the City’s Comprehensive Zoning Ordinance of 1970, (the “1970 CZO”). The two property owners associations later intervened seeking the same relief as the City.
At the first trial the court found that the City’s action had prescribed under the two-year limitation provided by La.R.S. 9:5625, as in effect until July 21, 1972, and that the property enjoyed a legal non-conforming use status. In City of New Orleans v. Elms, 498 So.2d 773 (La.App. 4th Cir.1986), this court reversed the judgment of the trial court, finding that the City’s suit was timely filed since the City first acquired the requisite knowledge of the zoning violation, under La.R.S. 9:5625 as amended and effective July 26, 1972, in May 1983. We also found that the Elms House had not acquired a legal non-conforming use status.
After reversing the trial court judgment and granting the City and intervenors a preliminary injunction, we remanded the case to the trial court for a hearing to convert the preliminary injunction into a permanent one. After remand, and another hearing where further testimony was heard, the trial court again found that the City’s action had prescribed under La.R.S. 9:5625 (as in effect through July 25, 1972) and the property had acquired a legal nonconforming use status.
The Elms House is a large home located at 3029 St. Charles Avenue. Under the 1970 CZO the property is zoned “RM-3”, multiple family residential district. Sometime in 1969 defendants began operating a commercial party and reception hall business. Commercial tours of the mansion were also given. Joyce Elms Benchabbat was the only defendant to testify at trial and at present she is apparently the sole owner of the Elms House and operates the business. It is undisputed that the use of the mansion for these purposes is in violation of the 1970 CZO.
As it existed prior to July 26, 1972, La.R. S. 9:5625 provided that a municipality had two years to bring an action to enforce compliance with its zoning laws. In cases involving a regulatory use violation, such as the one at bar, the two-year prescriptive period ran from the date “the parish, municipality or their instrumentality first had knowledge of such violation ...” In 1972 *19 the legislature amended the statute to provide that the prescriptive period would run from the date the municipality and their “properly authorized instrumentality” or “designated” agency was first “actually notified in writing of such violation.”
The City’s suit was filed on November 18, 1983 after the Department of Safety and Permits was first notified in writing of the use violation in May, 1983. Clearly, the suit was timely filed under the current provisions of La.R.S. 9:5625. Defendants argue, however, that the pre-1972 version of the statute is applicable. They contend that the City or its instrumentality had knowledge of the use violations[1] beginning sometime between 1969, when they began using the mansion on a commercial basis, and July 26, 1972. Their argument is based upon the testimony of three New Orleans police officers who worked off-duty security details at the mansion during that period, and a provision of the Comprehensive Zoning Ordinance of 1953 (the “1953 CZO”) which was in effect until August 1, 1970 when the 1970 CZO took effect.
Article XXXI, Section 1 of the 1953 CZO states:
“It shall be the duty of the Director of Regulatory Inspections to enforce this Ordinance. It shall also be the duty of all officers and employees of the City, and especially of all members of the Police Department, to assist the Director by reporting to him upon new construction, reconstruction, or land uses, or upon seeming violations.”
The 1970 CZO contains no such clause.
Old La.R.S. 9:5625 refers to knowledge by a municipality or its “instrumentality.” Defendants apparently interpret instrumentality to include police officers. We disagree, feeling that the instrumentality is the Director of Regulatory Inspections, who is authorized to enforce the Ordinance. See Parish of Jefferson v. Groetsch, 256 So.2d 722 (La.App. 4th Cir.1972), writ denied, 260 La. 1204, 258 So.2d 552 (1972). Otherwise it would follow that knowledge by a sanitation worker — an employee of the City — would be sufficient to commence the running of prescription. But we agree that knowledge of the zoning violations by the Director of Regulatory Inspections would have been sufficient to commence the running of prescription.
Defendants argue, and the trial court found, that the City or its instrumentality had actual or constructive knowledge of the zoning violation(s). This is incorrect. There is no evidence in the record that the City or the Director of Regulatory Inspections had actual or constructive knowledge of any zoning violations by the defendant.
The dispositive issue is whether any knowledge of the zoning violations could have been imputed to the Director of Regulatory Inspections by virtue of any actual or constructive knowledge possessed by the three police officers.
All three of the police officers had retired from the New Orleans Police Department at the time of trial. Officers Paul C. Fleming and Stephen Bordelon testified at the second trial and the deposition of Lt. Ernest M. Simoneaux, Sr. was introduced in evidence. The three officers had worked off-duty security details at the Elms House during the years 1969-1972. All three wore their official police uniforms while working these details. They were hired to provide security for the various functions, keep unauthorized persons out of the functions, and watch the invitees walk to their automobiles.
The officers were paid directly by Ms. Benchabbat and no portion of their salary went to the New Orleans Police Department or the City. A person or business desiring to hire a police officer for an off-duty security detail could contact either the individual police officer or the personnel department. The officer had to report the detail to his commanding officer or the personnel department. He had to give the district in which the detail was to be worked, the municipal address, the number of hours to be worked, and the type of *20 function. The police department had the authority to deny the officer the right to work the detail, but according to Lt. Simo-neaux, “they never did.” There was apparently just a “rubber stamp” approval.
Officer Fleming first worked a detail at the Elms House during the 1969 Mardi Gras season. He worked two or three wedding receptions after that, the last in late 1972 or 1973. Fleming was under the impression that Ms. Benchabbat was being paid for these events because she had large sums of money at the conclusion of them. He thought she was operating a business in her residence but testified that it “never entered his mind” that it was a zoning violation or that she was operating illegally-
Officer Bordelon first worked a security detail at the Elms House sometime in 1970, for a carnival function. He worked another detail at a wedding reception in mid-summer, 1971, and thought he worked two or three more after that. It was his impression that Ms. Benchabbat was operating a commercial business in the residence. When asked if there seemed to be a zoning violation, he replied that it seemed out of place but “it wasn’t his place” to check into zoning violations. Questioned by the court as to whether he had any idea that the property had a non-conforming use or whether Ms. Benchabbat had permits, Bor-delon replied, “No I wasn’t required to check anything like.”
In his deposition Lt. Ernest M. Simo-neaux, Sr. stated that he worked details at the Elms House from 1969-1972. He confirmed that during this period he worked approximately fifty to one hundred details per year at the mansion.[2] Because he saw people pay her, he said he knew Ms. Ben-chabbat was charging fees for the use of her premises. He knew that she was operating a business but never personally observed any type of contract negotiations. When asked if such use of the residence was in violation of a zoning ordinance Si-moneaux answered,
“It certainly came to mind to me that it was, but being a native Orleanian I went along, I was paid to do a detail there, and I didn’t think anymore about it, I was— well, in my mind it was more or less a violation.”
He did not report his suspicion to anyone because he said,
“I had no occasion. Nobody questioned that ... It’s just a simple detail like anybody else, walking behind a float at carnival or being at a party, dance, sorority hop.”
He further stated,
“there wasn’t a question in my mind this was, I don’t think, [sic] that it could be wrong. It never-nobody else done [sic] anything about it. I’m working a detail and making extra money for my family, like any other policeman on any other detail. I don’t think the question arose about the location or type of business or whether it was in violation.”
But in a final question asked on re-direct examination regarding why it seemed to him a violation of a zoning ordinance, he stated, “Well, being a house, being a house, to me, it was a little unusual to have — to be conducting a business, you know, in a house like that.”
For several reasons we find that this evidence is insufficient under La.R.S. 9:5625 to impute knowledge to the Director of Regulatory Inspection or the City so as to have commenced the running of prescription. The trial court clearly erred in finding to the contrary.
The purpose of zoning ordinances is to confine certain classes of buildings and uses of property to certain localities. Redfearn v. Creppel, 455 So.2d 1356 (La.1984). Under La.R.S. 9:5625 prescription has the effect of transforming an illegal nonconforming use into a legal non-conforming use. A non-conforming use is inconsistent with the objective of a zoning ordinance, and it should, consistently with the property rights of the individuals affected and substantial justice, be viewed narrowly and have all doubts resolved against its continuation or expansion. Redfearn v. Creppel, supra; City of Lake Charles v. Frank, 350 *21 So.2d 233 (La.App. 3rd Cir.1977). These guiding principles, we feel, should be used when examining the facts alleged to be sufficient to establish prescription and legalize and continue a non-conforming use under La.R.S. 9:5625.
There is no evidence that any of these three police officers had actual knowledge that the Elms House was being operated on a commercial basis in violation of a zoning ordinance. There was no evidence that any of these officers were aware of the provisions of either the 1953 or 1970 CZO’s. They could not have had actual knowledge that a law was being violated if they didn’t know the act was illegal. As to constructive knowledge, a party is charged with constructive knowledge (notice) of a fact when he possesses other facts from which it is concluded that he knew or should have known the fact in question. See Lawson v. Continental Southern Lines, 176 So.2d 220 (La.App. 2d Cir.1965). Again, we feel that a basic prerequisite to charging a person with constructive notice of a zoning violation is knowledge of the zoning laws. If the officers were aware of the zoning laws and observed these events, then perhaps they could have been charged with constructive notice of a violation. Other than the vague statement by Officer Bordelon that “it seemed out of place”, and two of Lt. Simoneaux’s statements which contradicted and conflicted with his other statements, there was no evidence that any of these police officers were remotely versed in zoning law.
Also, Article XXXI, Section I of the 1953 CZO, cited by defendants as imposing a duty on police officers to report even “seeming” violations to the Director of Regulatory Inspections, imposes the same duty upon all other officers and employees of the City. We feel this clause contemplates violations observed by these City officers and employees, including police officers, while they are engaged in the course of their employment with the City. These three police officers were off-duty, working as private security officers. They were performing services pursuant to a personal contract between themselves and Joyce Benchabbat. The services were being performed for Ms. Benchabbat — not the City. Louisiana courts have held that when an off-duty police officer takes a “required police action,” the City is liable for resulting torts. Benelli v. City of New Orleans, 478 So.2d 1370 (La.App. 4th Cir.1985). But we distinguish the imposition of tort liability on the City for the torts of off-duty police officers from the imputation of any type of knowledge to an unrelated City department head for even a “seeming” zoning violation observed by an off-duty police officer. As previously discussed, the record does not establish that any of these officers could have had a factual basis for suspecting a “seeming” zoning violation.
During the years 1969-1972 the defendants never advertised that the Elms House was available for parties, receptions, or tours. There were no outward manifestations that the mansion was being used on a commercial basis. Joyce Benchabbat testified that she could only prove that during these years she only had four or five functions a year. She said tours were not included in this number. In an earlier deposition she made unqualified statements that she only held two or three functions a year at the mansion. She never reported the income from these functions because it was insignificant. During these years no one ever applied for any permits or licenses from the City to operate a business at that location.
We find the evidence as a whole patently insufficient to support a finding that the City or its instrumentality had the type of knowledge contemplated by old La.R.S. 9:5625 as triggering the running of the two-year prescriptive period. The trial court clearly erred in finding otherwise. The November, 1983, suit filed by the City was timely.
As an alternative argument defendants contend that the property has acquired a legal non-conforming use status under the 1970 CZO other than by prescription. We previously addressed this issue in City of New Orleans v. Elms, 498 So.2d 773 (La.App. 4th Cir.1986). We stated:
*22 “Under the 1953 Ordinance defendants’ property was zoned D-Multiple Family District. A review of articles VIII, IX, X and XII of that ordinance shows permitted uses that include boarding and lodging houses, tourist homes, apartment hotels and fraternity, sorority and private clubs. There is no provision for a party or reception hall. Defendants argue that, even though their use is not specifically permitted, it should be validated by analogy to those uses which are recognized. They also argue that the 1953 Ordinance did not specifically exclude their activity.
We are not unmindful of the well recognized rule that zoning ordinances are in derogation of the rights of private ownership and, therefore must be strictly construed in favor of the use proposed by the owner. City of West Monroe v. Ouachita Ass’n, etc., 402 So.2d 259 (La.App. 2nd Cir.1981). However, we are also of the opinion that the uses permitted in a zoning ordinance should not be expanded by analogy. A zoning ordinance, by its very nature, sets forth the uses permitted and does not have to specifically exclude every non-permitted use. See, Article V, Sec. 1 of the 1953 Ordinance. The permitted uses to which defendants analogize are tourist homes, and boarding or lodging houses. Reviewing the definitions of those uses in the 1953 Ordinance this Court points out that both provide for no more than 15 rooms with sleeping facilities, where meals and lodging are provided for not more than twenty persons. An apartment hotel is defined as catering to permanent tenants, and not transients. The private party or reception hall business conducted by defendants is not similar to the residential type uses of a tourist or lodging home. It is not compatible with the dwelling uses permitted by the D-Multiple Family District classification. We therefore hold that the activities conducted by defendants in 1969 were in violation of the uses permitted by the 1953 Ordinance.”
We went on to find that a legal non-conforming use of the property could be established under the 1970 CZO only if it had been permitted under the 1952 CZO. Since we found the use had not been permitted under the 1953 CZO we held that the property had not acquired a legal non-conforming use.
Our previous decision equally applies to the identical facts present in the case at bar. We will, however, consider the testimony of Paul May, who testified during the second hearing. Mr. May is the Zoning Administrator for the Department of Safety and Permits for the City of New Orleans. May agreed that some of the uses permitted under the 1953 CZO were similar in nature (analogous) to renting one’s family home for functions such as those for which defendants rented the Elms House.
Defendants note that, unlike the 1970 CZO, the 1953 CZO contains no clause stating that “uses not specifically listed [permitted] are prohibited.” See: Article 4, Section 5 of the 1970 CZO. Therefore, it is argued, under the 1953 CZO uses similar to those specifically listed as permitted should also be permitted. Even if the defendants’ use of the Elms House is “similar” to the uses specifically listed as permitted, we have previously rejected this argument, holding that “uses permitted in a zoning ordinance should not be expanded by analogy.” City of New Orleans v. Elms, supra.
Defendants cite La.C.C. art. 783 which states:
“Doubt as to the existence, validity, or extent of building restrictions is resolved in favor of the unrestricted use of the immovable.”
This article is only applicable to building restrictions which are defined in La.C.C. art. 775 as “charges imposed by the owner of an immovable ...” La.C.C. art. 776 states that “[b]uilding restrictions may be established only by juridical act executed by the owner of an immovable or by all the owners of the affected immovable.” Defendants’ reliance on La.C.C. art. 783 is misplaced. It is clear that municipal zoning regulations are not building restrictions.
*23 Defendants also cite the case of City of New Orleans v. Buffa, 69 So.2d 140 (La.App. Orleans 1953), in which the court stated that,
“a Zoning Ordinance, being in derogation of the rights of private ownership ... must be strictly construed on behalf of the owner thereof ...”
We have previously cited the principle espoused by the Louisiana Supreme Court, that a nonconforming use should be viewed narrowly and have doubts resolved against its continuation or expansion. Redfearn v. Creppel, supra; City of Lake Charles v. Frank, supra.
For the foregoing reasons we reverse the judgment of the trial court and issue a permanent injunction restraining and enjoining defendants, John J. Elms, Jr., Joyce Elms Benchabbat, and Jacques Benchabbat from using the premises located at 3029 St. Charles Avenue in the City of New Orleans for any purpose in violation of the Comprehensive Zoning Ordinance of 1970, Ordinance 4264 M.C.S.
REVERSED AND RENDERED.

. For purposes of examining the issue of prescription we will assume that defendants commercial use of the property violated the 1953 CZO, as well as the 1970 CZO.

. This figure is questionable, even considering Ms. Benchabbat's trial testimony.