566 So.2d 626 (1990)
CITY OF NEW ORLEANS
v.
John J. ELMS, Jr., Joyce Elms Benchabbat and Jacques Benchabbat.
No. 89-C-1472.
Supreme Court of Louisiana.
July 31, 1990.
Rehearings Denied September 5, 1990.
*627 Mack E. Barham, Robert E. Arceneaux, Gail N. Wise, Barham & Associates, Nat G. Kiefer, Jr., for John J. Elms, Jr., et al., defendant-applicant.
William R. Pitts, Cheryl V. Cunningham, Liskow & Lewis, Okla Jones, II, City Atty., Don Hernandez, Chief Deputy City Atty., Kathy lee Torregano, Deputy City Atty., for City of New Orleans, plaintiff-respondent.
LEMMON, Justice.[*]
This is an action by the City of New Orleans to enjoin a violation of the Comprehensive Zoning Ordinance. The principal issue is whether the City is barred by prescription from enjoining defendants' use of their property located in a multiple-family residential district for wedding receptions, private parties and public tours.
In 1969 Mrs. Joyce Benchabbat, one of the owners of the mansion located at 3029 St. Charles Avenue known as the Elms House, began renting the building occasionally for wedding receptions and private parties. The occasional rentals continued until 1983, when Mrs. Benchabbat bought the interests of the other co-owners, renovated the building, and moved into the building as her home. About the same time she began to increase the commercial usage of the property and to offer public tours.
*628 Almost immediately neighbors filed a written complaint with the City's Department of Safety and Permits, and the City notified the owners that this use violated the existing zoning ordinance. When the owners did not cease the commercial use, the City filed this action in November, 1983, seeking to enjoin the owners from operating a business on the property or from otherwise violating the provisions of the zoning ordinance.
Defendants' answer asserted several defenses. One of the defenses was that the right to enjoin the violations had prescribed under La.Rev.Stat. 9:5625 A, which provides a two-year prescriptive period for "[a]ll actions ... which may be brought by parishes, municipalities or their instrumentalities... to require enforcement of and compliance with any zoning restriction ... imposed by any parish, municipality or their instrumentalities...."
After trial on the rule for a preliminary injunction, the district court determined that the commercial use of the Elms House was a "lawful nonconforming use" which had been in existence for more than two years and could not be restricted by the City.
The court of appeal reversed and ordered a preliminary injunction. 498 So.2d 773. The court determined that defendants had failed to bear the burden of proving sufficient knowledge by the City of a zoning violation so as to begin the running of prescription. The court further held that the property was not entitled to nonconforming use status under the present ordinance because the use, which had begun under an earlier ordinance, was also unlawful under that ordinance.[1] The case was accordingly remanded to the district court for a hearing on the final injunction.
At the trial on the merits of the final injunction the district court found that defendants had used the property for commercial purposes "on a regular and consistent basis" since 1969 and that the City had actual and/or constructive knowledge of the commercial use because the New Orleans Police Department had furnished uniformed officers for the events held on the property. The court ruled that when the City failed to seek an injunction based on this knowledge, the property acquired nonconforming use status by prescription of two years under La.Rev.Stat. 9:5625.
The court of appeal again reversed, holding that the trial judge's finding of the City's constructive knowledge of a violation which began the running of prescription was manifestly erroneous. 542 So.2d 17. The court reasoned that because defendants failed to prove the police officers were familiar with the zoning laws, the City could not be charged with constructive knowledge of a zoning violation. The court accordingly ordered a final injunction prohibiting defendants from using the premises in violation of the ordinance.
We granted certiorari to determine the appropriateness of the injunction. 548 So.2d 1215.
Zoning is designed to foster improvements by confining certain classes of buildings and uses to certain localities without imposing undue hardship on property owners. 1 E. Yokley, Zoning Law and Practice § 2-2 (4th ed. 1978); Redfearn v. Creppel, 455 So.2d 1356 (La.1984). The essence of zoning is territorial division in keeping with the character of the lands and structures and their peculiar suitability for particular uses, and the uniformity of use within the division. E. Yokley, supra, at § 2-1. The traditional purpose of zoning is to reduce or eliminate the adverse effects of one type of land use on another by segregating different uses into different zoning districts. Redfearn v. Creppel, 455 So.2d 1356, 1360 (La.1984), (citing Village of Euclid v. Amber Realty Co., 272 U.S. *629 365, 387-95, 47 S.Ct. 114, 118-21, 71 L.Ed. 303 (1926)).
Zoning by its nature is a legislative function. Meyers v. City of Baton Rouge, 185 So.2d 278 (La.App. 1st Cir.1966); E. Yokley, supra, at § 2-1. La. Const. art. VI, § 16 grants local governing authorities the power to adopt zoning regulations and standards for use of areas and structures subject to procedures established by law.[2] La.Rev.Stat. 33;4721 further provides that "[f]or the purpose of promoting health, safety, morals, or the general welfare of the community, the governing authority of all municipalities may regulate and restrict... the location and use of the buildings, structures, and land for trade, industry, residence, or other purposes...." La.Rev. Stat. 33:4723 provides that zoning regulations "shall be made with reasonable consideration of the character of the district and its peculiar suitability for particular uses, and with a view to conserving the values of buildings and encouraging the most appropriate use of land throughout the municipality".
The principal regulation which has been utilized to carry out the purposes of zoning is the exclusion of commercial uses from residential districts.[3] Purely business uses are generally excluded from residential districts by simply omitting them from the list of permitted uses. R. Anderson, supra, at § 13.20.
When the occasional commercial leasing of the Elms House began in 1969, the property was included in a multiple-family residential district under the 1953 Comprehensive Zoning Ordinance.[4] In 1970 the City enacted a new Comprehensive Zoning Ordinance, under which the Elms House was again included in a multiple-family residential district.[5] The 1970 ordinance, which is presently in effect, contained a specific provision in Article 4, Section 5 that uses not listed were prohibited. Use of the Elms House for wedding receptions, private parties and public tours was therefore clearly prohibited by the 1970 ordinance.
Defendants contend, however, that their violations began in 1969, that the City had actual or constructive knowledge of the violations, and that the City's failure to bring an action to enforce the zoning ordinance within two years of the City's first knowledge of the violations bars the present action under La.Rev.Stat. 9:5625 A and entitles their property to nonconforming use status under La.Rev.Stat. 9:5625 B.[6]
One crucial issue in the present case involves the date when the two-year prescription commenced to accrue. Since La. Rev.Stat. 9:5625 A was amended after the initial use of the property for wedding receptions and private parties, both the original and the amended versions of Section 5625 A must be considered.
*630 When the commercial use of the Elms House began in 1969, Section 5625 A provided in pertinent part as to use violations:[7]
[W]ith reference to violations of use regulations... [all actions] must be brought within two years from the date the parish, municipality or their instrumentality first had knowledge of such violation.... (emphasis added).
In 1972 Section 5625 A was amended to provide:
[W]ith reference to violations of use regulations all such actions ... must be brought within two years from the date the parish, municipality and their properly authorized instrumentality or agency if such agency has been designated, first had been actually notified in writing of such violation. (emphasis added).
After the 1972 amendment the City's properly authorized instrumentality did not receive written notice of the violation until 1983, and the suit was filed within a few months.[8] Therefore, the critical period for determining the commencement of prescription is the three-year period between 1969 and 1972, when the statute was amended to require actual notice in writing of a violation.
Defendants contend that prescription began to accrue in 1969 when the City first had knowledge of the commercial use. The party pleading an exception of prescription in a zoning enforcement case has the burden of proving that prescription has accrued. City of New Orleans v. Century Management Inc., 442 So.2d 831 (La.App. 4th Cir.1983); Parish of Jefferson v. Groetsch, 256 So.2d 722 (La.App. 4th Cir. 1972), cert. denied, 260 La. 1204, 258 So.2d 552 (1972); Irland v. Barron, 230 So.2d 880 (La.App. 2d Cir.1970). It was therefore necessary for defendants, in order to prevail on their exception of prescription, to prove all of the essential elements for the accrual of prescription under the pre-1972 version of Section 5625 A. The key essential element of proof pertinent to this case was the "knowledge of such violation" by the City.[9]
As to actual knowledge, there was no proof of written or verbal notice to the City of any violation before 1983, and there were no documents filed with the City or the Department indicating commercial use between 1969 and 1972. Cf. Dudenheffer v. City of New Orleans, 482 So.2d 175 (La.App. 4th Cir.1986) (the City was held to have actual knowledge of commercial use of property in violation of zoning ordinance because the property owner summoned the City to his property to upgrade the electrical service for a seafood wholesale business and made written applications to the Department of Safety and Permits stating that circuits were being added for a welding machine, refrigerated truck and ice machine); City of New Orleans v. Kirzner, 464 So.2d 864 (La.App. 4th Cir.1985), cert. denied, 466 So.2d 1303 (La.1985) (defendant's exception of prescription was maintained on the basis of the City's knowledge of a use violation based on the fact that the City licensed defendant's wholesale candy and snack peddling business at a business address which was the defendant's residence). Moreover, defendants did not present evidence that the Director of Safety and Permits or any other high ranking *631 city official had independent knowledge of a violation. Cf. East Baton Rouge Parish v. Bratcher, 244 So.2d 915 (La.App. 1st Cir.1971), cert. denied, 258 La. 364, 246 So.2d 684 (1971) (prescription began on the date an inspector from the City's Department of Public Works first observed a trailer on defendant's property which violated the zoning ordinance).
The evidence failed to establish actual knowledge on the part of the City or the Director of Safety and Permits. Defendants therefore had to rely on the doctrine of constructive knowledge as to a violation between 1969 and 1972.
Defendants contend that the City had constructive knowledge of the zoning violations through three off-duty police officers who provided security for the commercial events held at the Elms House. In support of this argument defendants place great reliance on the combined facts that La.Rev.Stat. 9:5625 A, prior to its 1972 amendment, did not expressly require actual knowledge of a violation on the part of a municipality and that Article XXII, Section 1 of the 1953 zoning ordinance (in effect during 1969) required police officers to report seeming violations of the zoning ordinance to the Director of Safety and Permits.[10]
As to the use of the property which gave rise to constructive knowledge on the part of the City, Mrs. Benchabbat, who inherited part ownership of the Elms House from her father in 1968 and became the sole owner in 1984, testified that the house was rented for social functions five or six times per year between 1969 and 1983.[11] After she moved into the house in 1983, she rented the property for about two events per week, and also began offering private tours.
The police officers who performed security work at the Elms House between 1969 and 1972 testified that it was common practice for an officer to accept off-duty employment, such as providing security at private functions, in order to earn extra income. The person requesting an officer contacted either the Police Department personnel office or the officer directly, and the officer was required to report the details of the employment, such as the address, the hours, and the type of function, to his commanding officer or personnel department for approval. The officer wore a police uniform, but was paid by the person requesting the service.
Officer Fleming testified that his first work at the Elms House was during the Mardi Gras season in 1969 and that he later worked three or four weddings in 1972 or 1973. His duty was to provide security against intruders who were not invited to the event. According to Fleming, he never considered whether a violation of the zoning ordinance was occurring. He presumed that everything was in order because police were present, and he did not know whether the owners had a permit. He never told his superiors that a business was being operated on the property, although he was told that Mrs. Benchabbat was paid for the use of the residential premises.
*632 Officer Bordelon testified that he worked at the Elms House for a carnival function in 1970, for a wedding in 1971, and for two other events. He noticed that the commercial business seemed out of place for a residence, although there were other businesses in the area, but did not believe it was his duty to check into zoning or permit violations. He also did not know whether the owners were paid for the events.
Officer Simoneaux testified that he worked at the Elms House for weddings, social functions, parties and tours from 1969 to 1972. He was unable to remember the exact number of events worked and gave a broad range of numbers.[12] He believed the property was used as a business operation because he observed a number of functions held there and sometimes saw money given to the owners at the end of a function. He suspected there was a zoning violation, but did not report his suspicion or the fact of the business operation to the Department of Safety and Permits because he did not believe it was his duty to do so.
On the other hand, the outward appearance of the property and the nature of the rental operation did not suggest commercial use. The availability of the Elms House for commercial leasing was not advertised before 1983, and there were no signs or markings at or near the residence that would indicate the property was being used for commercial purposes. Mrs. Benchabbat conceded that a passerby observing a function would not have known whether this was a commercial event or a private party given by the residence owner. Moreover, defendants did not apply for any type of occupational licenses or file any written document with the City which would have indicated commercial use of the property until 1975, when they applied to the City for a change in zoning classification from residential to commercial. Even then they represented to the City Council that the property was being used as a residence. In 1979 defendants filed a building permit with the City which stated that the Elms House was used as a single family dwelling.
The commercial use, therefore, was not so open and notorious as to give notice to the public generally which might be charged to the City. See Parish of Jefferson v. Groetsch, 256 So.2d 722 (La.App. 4th Cir.1972), cert. denied, 260 La. 1204, 258 So.2d 552 (1972) (there was no constructive or imputed knowledge on the Parish of zoning violations because there was no indication from all outward appearances that a business endeavor was being carried on at the home, and a passing motorist or pedestrian would not know or suspect a commercial activity was being conducted on the premises); Irland v. Barron, 230 So.2d 880 (La.App. 2d Cir.1970) (only intermittent use of the property by the parking of cars or boat trailers, mostly on weekends, coupled with the construction of picnic tables and the stacking of a quantity of creosote timbers thereon, was not sufficient to indicate to the public a commercial usage of this tract); see also City of Lafayette v. Black, 336 So.2d 982 (La.App. 3rd Cir.1976), cert. denied, 339 So.2d 850 (1976).
If it were not for the unusual provision in the City's 1953 zoning ordinance imposing the duty on City policemen to assist the Director of Safety and Permits in enforcing the zoning ordinance by reporting "seeming violations", defendants' proof would fall far short on the issue of constructive knowledge. However, this ordinance provision (which was effective until 1970), as well as La.Rev.Stat. 9:5625 A (which until 1972 did not expressly require actual knowledge), must be construed so as to resolve any doubt in favor of the property owner. Lozes v. Waterson, 513 So.2d 1155 (La.1987). A zoning ordinance, being in derogation of the rights of private ownership, must be construed, when subject to more than one reasonable interpretation, according to the interpretation which allows the least restricted use of the property. City of Kenner v. Normal Life of Louisiana, Inc., 483 So.2d 903 (La.1986). *633 Moreover, in determining the issue whether defendants met their burden of proof on the prescription issue, great deference must be given to the trial judge's reasonable evaluations of credibility and reasonable inferences of fact. Canter v. Koehring Co., 283 So.2d 716 (La.1973).
In most other jurisdictions, delay in initiating enforcement proceedings does not affect a municipality's right to enforce the zoning ordinance, at least in the absence of an express statute. R. Anderson, supra, § 29.15; P. Rohan, supra, 52.08[4]; 3 A. Rathkopf, The Law of Zoning and Planning § 45.05 (1983); 101A C.J.S. Zoning & Land Planning § 342 (1979); 82 Am. Jur.2d Zoning & Planning § 247 (1976). The Louisiana Legislature, in enacting the original version of La.Rev.Stat. 9:5625 A, adopted a statute which was very favorable to zoning violators, not only in limiting the municipality's right to bring an action to enjoin zoning violations to a period of two years, but also in fixing the beginning of the prescriptive period as the date that the municipality first had any knowledge of the violation from whatever source.[13] The City in this case compounded the disadvantages to zoning enforcement by enacting a provision in its own zoning ordinance which imposed a duty on City policemen to provide notice of "seeming violations" of the zoning ordinance to the Director of Safety and Permits, thereby legislating a method by which constructive notice of a violation may be charged to the City on the basis of knowledge of a "seeming violation" by any member of the Police Department.[14]
The evidence in this case established that officers of the New Orleans Police Department, while in full uniform on off-duty employment approved by the Department, were aware that commercial activities were taking place in the residential building between 1969 and 1972, and especially in the critical year of 1969 when the zoning ordinance provision on "seeming violations" was still in effect. The trial judge reasonably found from this evidence that these police officers were aware of "seeming violations" of the zoning ordinance and that the ordinance itself imposed a duty on the officers to report these seeming violations to the Director of Safety and Permits in order to assist the Director in enforcing the ordinance. We conclude there was no manifest error in the trial judge's decision that the knowledge by police officers charged with the duty in assisting in enforcement of the zoning ordinance in 1969 constituted constructive knowledge on the part of the Director, since any doubt as to the meaning of the ordinance must be resolved in favor of the property owner. When La.Rev.Stat. 9:5625 A and the City's zoning ordinance are interpreted most favorably to the property owner under the facts of this case as found by the trial judge, prescription began to accrue in 1969.
The City contends, however, that defendants cannot prevail on their prescription defense because they did not use the property for commercial purpose on a regular and consistent basis during the period that prescription was accruing.
Under the pre-1972 version of La.Rev. Stat. 9:5625 A prescription commenced to run when the City "first had knowledge of such violation". As noted above, this record supports the trial court's finding that the City had constructive knowledge of the violation in 1969, and prescription therefore began to run at that time. This constructive knowledge imposed a duty on the City to take steps to halt the zoning violation (just as the City did in 1983, when informed in writing of the violation, by notifying the owners to cease the commercial activity). If the City had notified the owners in 1969 to cease the commercial activity, then defendants' lack of use of the property for commercial purposes after being *634 notified to cease these activities might defeat their right to assert the prescription defense. However, the City did not take any action after having constructive knowledge of the violation, and the regularity of defendants' commercial use of the property thereafter becomes relevant only to the issue of defendants' abandonment of the nonconforming use status acquired by prescription.
Nonconforming use status, once attained, may be lost if the property is not used for the nonconforming purpose for a continuous period of six months. New Orleans, La. Comprehensive Zoning Ordinance, art. XXIV, § 2. The burden of proving termination of nonconforming use status by abandonment or discontinuance is on the party urging termination of the status. R. Anderson, supra, at § 6.65; P. Rohan, supra, at § 41.03(6)(b). On the record in this case the City failed to meet this burden of proof.
We conclude that the trial judge properly dismissed the action as prescribed. We further conclude that defendants' property was entitled to nonconforming use status under La.Rev.Stat. 9:5625 B when prescription accrued in 1971 and that the nonconforming use status thereby attained has not been lost by abandonment or discontinuance.
For these reasons the judgment of the court of appeal is reversed, and the action is dismissed.
NOTES
[*] Retired Chief Justice John A. Dixon, Jr. participated in this case, having been a member and Chief Justice of this court when the case was orally argued and taken under advisement.

Judge J. Louis Watkins, Jr., of the Court of Appeal, First Circuit, participated in this decision as Associate Justice Ad Hoc in place of Justice Pascal F. Calogero, Jr., who was recused.
[1] Nonconforming use status is designed to protect those uses which were legally established before the enactment of a restrictive regulation. Thus, a nonconforming use is one which was lawful prior to the enactment of a particular zoning regulation and which is continued after the effective date of the regulation, although the continued use violates the new zoning restrictions for the district in which the property is situated. Redfearn v. Creppel, 455 So.2d 1356 (La.1984); 1 R. Anderson, American Law of Zoning § 6.01 (3d ed. 1986).
[2] La. Const. art. 14, § 29 (1921) provided the same power.
[3] This court, as early as 1925, recognized:

[A] municipal ordinance proscribing business establishments in a designated residence street or district does not necessarily rest on aesthetic considerations, but may be sustained on considerations of public health, safety, comfort, or general welfare, in view of better police protection, economy in street paving, lessening of fire hazard, and likelihood of business establishment being a genuine nuisance.
State ex rel. Giangrosso v. City of New Orleans, 159 La. 1016, 1017, 106 So. 549, 550 (1925); R. Anderson, supra, at § 9.26.
[4] The uses specifically permitted in this particular district (in addition to the uses allowed under more restrictive residential districts such as single, two and four-family districts) included multiple-family dwellings, apartment hotels, tourist homes, nursing homes, private schools and accessory buildings customary and incidental thereto. New Orleans, La., Comprehensive Zoning Ordinance, art. XII, § 2 (1953).
[5] Uses of property in this district were restricted to two-family and multiple-family dwellings, townhouses, boarding houses, convents, child care centers, group homes, and other permitted uses in single-family residential districts. New Orleans, La., Comprehensive Zoning Ordinance, art. 5, § 5 (1970).
[6] As noted earlier, Section 5625 A provides a two-year prescriptive period. After the two-year prescription has accrued, the particular property thereafter "shall enjoy the same legal status as land uses ... made nonconforming by" other provisions of the zoning ordinance. La.Rev. Stat. 9:5625 B.
[7] As to violations other than use violations, prescription began to run on the date of the "first act constituting the commission of the violation". La.Rev.Stat. 9:5625 A.
[8] The proper instrumentality is the Department of Safety and Permits. Under the 1953 ordinance, as amended at the time commercial use of the Elms House began, the Director of the Department of Safety and Permits had the duty to enforce the zoning ordinance. New Orleans, La., Comprehensive Zoning Ordinance, art. XXXI, § 1 (1953). Under the 1970 ordinance written complaints were required to be filed with the Department of Safety and Permits. New Orleans, La., Comprehensive Zoning Ordinance, art. 15, § 2.13 (1970).
[9] When a use restriction is involved, the requirement of knowledge on the part of the proper governmental agency is an essential element of the proof. City of New Orleans v. Century Management Inc., 442 So.2d 831 (La.App. 4th Cir.1983); Parish of Jefferson v. Groetsch, 256 So.2d 722¢ (La.App. 4th Cir.1972), cert. denied, 260 La. 1204, 258 So.2d 552 (1972); Irland v. Barron, 230 So.2d 880 (La.App. 2d Cir.1970).
[10] Article XXII, Section 1 of the 1953 ordinance provided as follows:

It shall be the duty of the Director, Safety and Permits, to enforce this Ordinance. It shall also be the duty of all officers and employees of the City, and especially of all members of the Police Department, to assist the Director by reporting to him upon new construction, reconstruction, or land uses, or upon seeming violations. (emphasis added).
When the new zoning ordinance was enacted in 1970, the quoted provision was omitted.
[11] An estimate of two or three times per year was given in a deposition. At trial Mrs. Benchabbat, after gathering and reviewing affidavits from various persons who had rented the premises during the pertinent period, reconsidered her deposition testimony and increased her estimate to five or six events per year.

Prior to 1983 Mrs. Benchabbat kept no business records evidencing the number of functions held or the fact that money was paid for use of the house. She was unable to produce any events calendars, contracts or evidence of receipt of payments. She also did not advertise the property for rental, obtained no permits or licenses, and paid no sales or income taxes. The evidence concerning frequency of use consisted solely of her recollections and of affidavits from persons who held functions at the house and paid for use of the property.
[12] Officer Simoneaux stated that there were nine to one hundred events per year at the Elms House and at least one tour per week. Mrs. Benchabbat's estimate of events and denial of public tours before 1983 significantly conflicted with Simoneaux's testimony.
[13] The Legislature, in amending Section 5625 A in 1972, tightened the statute considerably by requiring actual notice in writing of a zoning violation to the municipality or to its properly authorized and designated instrumentality in order to commence the running of prescription. The 1972 amendment also tightened the statute further as to the instrumentality to which written notice of the violation must be directed.
[14] The City apparently recognized the disadvantages of this provision in the zoning ordinance and totally eliminated that provision in 1970.