533 So.2d 1352 (1988)
Peter A. CIAMBOTTI, Plaintiff-Appellee,
v.
DECATUR-ST. LOUIS, LUPIN, PROPERTIES VENTURES, A Louisiana Partnership, et al., Defendants-Appellants.
No. 87-843.
Court of Appeal of Louisiana, Third Circuit.
November 9, 1988.
*1353 Peter A. Ciambotti, Lake Charles, for plaintiff-appellee.
Barry W. Miller, Baton Rouge, for defendants-appellants.
Before FORET, DOUCET and YELVERTON, JJ.
DOUCET, Judge.
This is an appeal from a trial court judgment which granted plaintiff's request to permanently enjoin the cashing, funding, payment or collection of a certain letter of credit bearing number 179 issued by the Calcasieu Marine National Bank of Lake Charles in the amount of $30,000.00. This letter of credit was initially issued as a condition of plaintiff's purchase of one share of a limited partnership interest in the Decatur-St. Louis, Lupin Properties, Venture. The partnership pledged the aforementioned letter of credit to the First National Bank of Jefferson (FNBJ) as security for interim construction financing. Subsequently, the loan went into default and FNBJ sought to collect on the letter of credit. The partnership went into Bankruptcy on May 11, 1983, and as a result thereof, the letter of credit was returned to the partnership.
It was approximately mid-July of 1979 that Mr. Robert Harger, an official of Combined Equity, Inc., which is the general partner for defendant, traveled to Lake Charles, Louisiana to sell plaintiff an interest in a partnership in commendam, which was, at that time, named "Decatur-St. Louis, Lupin Properties Venture." At least one lengthy meeting was held in which plaintiff, Harger, and plaintiff's attorney, Winfield Little, were present. During these meetings, the parties went through the prospectus or private placement memorandum (PPM) in detail. It was conveyed to Harger that even though tax advantages would be important to plaintiff, a sound financial foundation was even more important. The parties discussed the architect, the general contractor and the general partner, Mr. Lupin. Plaintiff was informed by Harger that the PPM was current. The only negative aspects of the project that were revealed to plaintiff was that like any other investment there were risks involved and that there was a potential problem in obtaining permits from the Vieux Carre Commission. Plaintiff specifically questioned Harger about any other problems and plaintiff was assured that there were none. At no time did Harger mention the dispute between the architect (Leon Impastato) and the contractor (Clyde Abercrombie) on the one hand and the partnership on the other.
Shortly after plaintiff met with Harger, he telephoned E. Ralph Lupin, the general partner at that time, and discussed the same matters that were discussed with Harger. Specifically, plaintiff questioned Lupin about the partnership, its purpose, its construction projects, etc.... Plaintiff inquired about the identity of the general partner and whether there were any negative aspects other than those stated in the PPM. Plaintiff was assured by Lupin that it was a sound project and that there was nothing to be concerned with.
After considering the PPM and the representations made by Harger and Lupin, plaintiff made the decision to purchase an interest in the partnership. Plaintiff made his initial payment on his interest on July 26, 1979. The partnership interest was purchased for $52,500.00, consisting of a promissory note for $19,500.00, a letter of credit for $30,000.00, and cash in the amount of $3,000.00. Plaintiff was not officially admitted into the partnership until October 3, 1979, when the articles of the previously existing partnership were amended to permit the admission of new partners vis-a-vis the second offering of the syndication of the partnership.
The original partnership was formed by Dr. E. Ralph Lupin, Dr. Arnold Lupin, Leon J. Impastato, and R. Clyde Abercrombie, on June 25, 1976. At this time, Drs.
*1354 Ralph Lupin and Arnold Lupin owned various tracts fronting on Decatur and St. Louis Streets in New Orleans. The partnership was formed to develop the property into a viable hotel project. Impastato and Abercrombie were to supply the architectural and contracting services, respectively, in return for their interests in the partnership. It was proposed that 507 Decatur Street be purchased by the partnership but Arnold Lupin did not wish to invest any more money into the project, thus, the partnership did not acquire this piece of property. The property was purchased by Dr. Ralph Lupin, Impastato and Abercrombie in their individual capacities on September 1, 1978. It was contended by defendant that the property was purchased on behalf of the partnership and partnership funds were used to make the purchase. Litigation over the ownership of this particular piece of property ensued and findings were rendered by the Special Commissioner and Judge Ad Hoc for the Parish of Orleans. The Special Commissioner placed the partnership in possession of 507 Decatur Street and declared the partnership its rightful owner. We take judicial notice of these findings.
On May 23, 1979, the first offering of the partnership as a partnership in commendam was closed. Dr. Ralph Lupin was named as the General Partner and Impastato and Abercrombie were designated Class A Limited Partners.
Shortly after the initial offering was closed, a serious dispute developed between Impastato and Abercrombie on the one hand and Dr. Lupin on the other. As a direct result of these disputes, Abercrombie formally resigned as contractor for the project on June 7, 1979, and Impastato formally withdrew his services as architect for the project on June 14, 1979. Their interests in the partnership were subsequently bought out by Combined Equities. These events occurred considerably before plaintiff purchased his share and was admitted to the partnership, however, these facts were not revealed to plaintiff until after his admission to the partnership. When the second offering was closed, Dr. Lupin was made a Class A limited partner and Combined Equities took over as the general partner.
In late November of 1979, plaintiff received a bound booklet outlining a chronology of events. The booklet contained partnership amendments. The information revealed for the first time the disputes between the general partner (Lupin) and Abercrombie and Impastato. The information further revealed that these disputes caused a work stoppage on the project. Additionally, plaintiff was at this time informed that F.A. Nobile was hired as the contractor to replace Impastato and Abercrombie. This information was received long after plaintiff's formal admission into the partnership. At this point in time, plaintiff had already paid a $3,000.00 cash payment and a $4,000.00 payment on a promissory note.
Plaintiff petitioned for and secured a temporary restraining order which prohibited the cashing, funding, payment or collection of the letter of credit which was issued by plaintiff in accordance with the acquisition of his partnership interest. The temporary restraining order continued in effect by consent until the commencement of the trial of this matter. The defendant-partnership ultimately filed an answer and reconventional demand requesting the funding of the letter of credit in the outstanding balance of $22,500.00 and interest and attorney's fees as damages for the wrongful issuance of the temporary restraining order.
Trial on the merits on the permanent injunction was held and the court granted plaintiff's request to permanently enjoin the cashing, funding, payment or collection of the letter of credit. Moreover, the lower court dismissed the reconventional demand. It is from this judgment that defendant appeals.
We first address defendants' contention that the trial court erred in finding that there was any evidence of fraud on the part of the defendant. In order to determine whether the record supports the trial judge's findings with respect to this issue, *1355 a review of the record evidence is necessary.
Leon Impastato testified that he is an expert in restorations and traditional architecture and has received twenty-seven awards for his design from the Vieux Carre Commission. Impastato added that a large amount of his work has been featured in both national and international magazines. The various French Quarter associations he is a member of include the Vieux Carre Property Holders Organization, the Lower French Quarter Association, and the Esplanade Avenue Improvement Association. Impastato has been recognized by several courts in Louisiana to be an expert in the field of traditional architecture. Thus, Impastato was an asset to the partnership. Impastato stated that he became a partner in the partnership and that he was to provide architectural services in exchange for his interest in the partnership. Impastato added that he obtained permits and final approval on the French Market Inn and then obtained permits for the future hotel rooms. Impastato designed the hotels and the drawings were approved. Impastato testified that while permits were granted for his plans, when he terminated his services on the project, the permits for the hotels were also terminated. Impastato added that as a result, instead of building hotels, apartments would have to be built. Impastato opined that this factor had a significant impact on the project since the profit margin is higher for a hotel than an apartment building. Impastato stated that there were internal disputes as early as 1978 when Ralph Lupin wanted to push him and Abercrombie out of the project to regain control over it. Impastato added that when he and Abercrombie resigned as architect and contractor, their interests were bought out by Combined Equities. During the course of these events, Impastato and Abercrombie revoked their continuing guarantees of credit with FNBJ and expressly disapproved any disbursements without their approval. With regard to the property located at 507 Decatur Street, Impastato opined that it was a "key" piece of property and was important to the development of the project.
The testimony of R. Clyde Abercrombie indicates that he became a partner in exchange for his services as general contractor. In addition to providing his contracting services, it was agreed that Abercrombie would perform certain managerial functions on the project. Abercrombie testified that there were internal disputes within the partnership from the time the limited partners were admitted into the partnership until he withdrew. With respect to 507 Decatur, Abercrombie testified that he bought the piece of property individually with two other partners.
Winfield Little testified on behalf of plaintiff. Little is an attorney and was the one who suggested that plaintiff invest in the partnership. Little stated that even though plaintiff desired tax advantages, a sound economic foundation was also important. Little was present at the initial meeting between Harger (official of Combined Equities) and plaintiff. Little added that during this initial meeting, the identity of the architect, contractor and general partner was discussed. Additionally, Little added that Harger assured them that the prospectus was current. Harger did not reveal any internal disputes, nor did he indicate that there was an ownership dispute to 507 Decatur or that Abercrombie and Impastato had withdrawn their letter of guarantee at FNBJ. Additionally, Little stated that Harger never revealed that there were significant problems getting permits other than with the Vieux Carre Commission. Moreover, he was never told that Abercrombie had resigned as of June 7, 1979, nor that F.A. Nobile would be replacing him. Little testified that Harger didn't disclose that the venture was in serious financial condition. Little stated that these factors would have been important in aiding him to advise his client (plaintiff), fully. Little stated that he wrote several letters at the urging of plaintiff in order to obtain financial information from the partnership. On June 30, 1980, August 5, 1980, and August 9, 1980, Little wrote to Hardy Swires with Combined Equities requesting partnership monthly balance sheets, profit *1356 and loss statements and basic fundamental informational reports concerning French Market Inn (Partnership hotel). These requests were to no avail as he received none of the information requested. Little testified that this was in direct violation of what was required of the partnership as stated in the PPM. Little stated that he then received a letter written by Richard Matheny, informing that he would be in charge of communications and that he was in the process of preparing reports and to expect them in two weeks. Little added that he never received the promised reports. On October 2, 1980, nearly one year after the first request for financial information, Little received the 1979 partnership tax return but still did not receive the profit and loss statements and balance sheets. Finally, on October 20, 1980, Little received a profit and loss statement and a balance sheet. This same month, Little informed Matheny that plaintiff did not receive information fully and timely as was promised by Harger and as was outlined in the PPM.
Robert Jackson, an attorney and president of Combined Equity Services, testified that he told Harger that there were serious problems with Abercrombie and that Abercrombie sent in his letter of resignation on June 7, 1979, and was replaced by Nobile on July 10, 1979. Thus, according to Jackson, Harger had knowledge of these facts. Moreover, when Jackson was questioned whether the permit on 521 Decatur was lost because construction was not commenced within six months, he declined to deny such fact. Furthermore, Jackson admitted that the same PPM was used for both the first and second offering. Jackson also admitted that he, along with Swires, received a memo from Combined Equities on May 16, 1979, indicating problems with Abercrombie's work such as invoicing for unsupportable reimbursement of funds.
Plaintiff, Ciambotti, testified that Harger came to Lake Charles to talk about the possibility of investing in the partnership on two different occasions. Plaintiff added that the decision to join the partnership was based on the information contained in the PPM and on the assurances by Harger that there were no other negative aspects of the investments than those listed in the PPM. Plaintiff added that Mr. Lupin, the general partner at that time, assured him that any risks that were involved were stated within the four corners of the document (PPM). Plaintiff further stated that had he been aware that some of the allegedly owned properties were involved in litigation, he would not have joined the partnership. Additionally, plaintiff stated that he would not have joined the partnership had he known of the Abercrombie and Impastasto disputes. Moreover, plaintiff added that he would not have joined the partnership had he known of the fact that the two had withdrawn their letters of credit and that they had withdrawn from the partnership. Plaintiff stated that Harger informed him that both Abercrombie and Impastato were partners and that they were to provide their services to the partnership. Plaintiff stated that he was aware the PPM represented this fact. Plaintiff was never told that on June 7, 1979, Abercrombie formally withdrew his services and that on July 10, 1979, Nobile had taken over as general contractor. Plaintiff testified that he was not informed that there were construction problems in the project. Plaintiff added that he signed all of the necessary documents on July 25, 1979, but was admitted into the partnership on October 3, 1979, through the use of a power of attorney. Plaintiff indicated that he received materials in late November or early December and for the first time was he notified about the fundamental changes going on in the partnership. Plaintiff became very concerned over this new information that had surfaced. He testified that he started calling for "hard financial data." Plaintiff never received the requested information. This is when plaintiff approached Winfield Little to act on his behalf. Plaintiff stated that Little was not successful either. It was at this time (1980), plaintiff decided that despite the tax consequences, he desired to get out of the partnership. Plaintiff admits to receiving some information but stated that it was *1357 never on an ongoing basis. In 1981, plaintiff went to talk to another attorney, Jack Wheeler, to act on his behalf. The primary reason why plaintiff approached Wheeler was to get out of the partnership altogether. Plaintiff admits that he was made an offer but that he rejected it because it was totally unacceptable. Plaintiff did not want to have any further dealings with the partnership. Plaintiff did not want their notes because based on his prior dealings with the partnership, he didn't have any expectation that they would honor their agreement.
Jack Wheeler testified that plaintiff contacted him to represent his interests. Wheeler stated that he sent a letter to Combined Equities and demanded information and a return of plaintiff's investment in the partnership. Wheeler added that as of late 1981 or early 1982, he never received anything except for a counter proposal for a settlement.
Daniel J. Fruge was hired by the partnership in June or July of 1981 to review the financial statements of the partnership. Combined Equities engaged Fruge to perform an audit of the books for the year ending December 31, 1981. Fruge issued a qualified opinion because there were $950,000.00 of fixed asset costs that were not supported by the invoices of the partnership. Fruge added that this would have occurred before December 31, 1979. Fruge questioned the ability of the partnership to continue as a viable entity. Fruge added that the financial status of the partnership was not in accordance with the projections in the PPM. Fruge testified that for the year ending December 31, 1979, the partnership generated a negative cash flow from operations at approximately $700,000.00. Fruge opined that the reason for the negative cash flow was because of permit problems. Fruge explained that because of these permit problems, only 50% of the total number of rooms projected were able to be built. Fruge added that this would severely impact the ability of the partnership to generate sufficient revenue to pay its expenses and to service its debt.
John Charles Anderson testified that he had an interest in the defendant-partnership. When Anderson became aware of all of the problems of the partnership, he demanded that he be bought out. Combined Equities "repurchased" his investment and issued him notes in exchange for his interest in the partnership but that when the first installment became due, it was not paid. Anderson filed suit to collect on the note.
The aforementioned evidence alone lends support to affirm the lower court's finding of fraud however, a review of the documentary evidence in the record lends further support for affirmation of the lower court. Specifically, the PPM contained many misrepresentations. One of these misrepresentations is that the partnership owned certain New Orleans property, including 507 Decatur Street when in reality, 507 was never in the name of the partnership, it being in the names of Ralph Lupin, Abercrombie and Impastato. While we are aware that the partnership has been placed in possession of this piece of property, the partnership was embroiled in costly litigation concerning the ownership of the property. Plaintiff was not made aware that there was a cloud on its title and we find, as did the trial court, that the partnership knew of this fact and failed to reveal it to plaintiff. Additionally, the PPM mentions Ralph Lupin, Abercrombie and Impastato and states that they have "extensive experience in renovation of French Quarter Properties." The PPM also states that Ralph Lupin was the general partner and that Abercrombie was to be the contractor and Impastato the architect. This is important when combined with the fact that the PPM represents that in a partnership in commendam, the financial strength of the general partner is a significant factor in the evaluation of an investment in the partnership. Additionally, a biography of the general partner is detailed in the PPM. The PPM states that Dr. Lupin is a resident of New Orleans and lives in the French Quarter and is deeply involved in preservation and restoration efforts throughout the French Quarter. Plaintiff relied on this representation as the identity *1358 of the general partner was an important consideration to him. Finally, the PPM states that it does not contain any untrue statement of a material fact or omit to state any material fact necessary to make the statements not misleading. Obviously, this is an untrue statement.
Based on the aforementioned, we find that the trial judge did not err when he found fraud on the part of defendant as the record clearly supports such a finding. With respect to defendant's assertion that the trial judge erred when he equated knowing and willful fraud with gross negligence, we find no merit. Even if the two are not one and the same as gross negligence requires no intent, we find that defendant's behavior clearly constituted fraud in the inducement.
With respect to defendant's assertion that even if fraud was present, plaintiff confirmed his purchase of the partnership agreement by signing certain documents, we also find no merit. Plaintiff received certain documents in December of 1979 disclosing several fundamental changes in the project and partnership structure. Defendants contend that had plaintiff not signed these documents, the changes could not have been made and he could have gotten out of the partnership at this point. Defendant adds that plaintiff's letter of credit was held in escrow and would have been returned to the plaintiff had he desired to withdraw from the partnership. We disagree. At the time plaintiff signed the purported confirmation, he was not fully apprised of the situation. Plaintiff made repeated attempts to obtain, as he phrased it, "hard financial data" concerning the status of the partnership but he was not made privy to this information for over a year after his first request. Plaintiff was in a precarious position since he could not obtain the information and since the partnership had his money. Contra to what the partnership contends, plaintiff's letter of credit was not held in escrow until the purported confirmation in December of 1979. Plaintiff's letter of credit had already been pledged by the partnership to FNBJ on October 3, 1979. Confirmation or ratification must be made knowingly and intelligently. We find that because of defendant's persistent evasiveness regarding useful financial data, there was no such confirmation.
Finally, defendant cites Cromwell v. Commerce and Energy Bank of Lafayette, 450 So.2d 1 (La.App. 3rd Cir.1984); writs granted, 456 So.2d 1389 (La.1984); affirmed, 464 So.2d 721 (La.1985); rehearing denied, (1985), in support of its position. However, we find that Cromwell, supra, directly supports plaintiff's position... that where there is fraud by a beneficiary or knowledge of fraud on the part of the agent of the beneficiary, the beneficiary or its agent cannot draw upon a letter of credit. Since the partnership is the beneficiary in this case and since we found that the partnership perpetrated a fraud upon plaintiff, Cromwell, supra, dictates that the partnership cannot draw upon the letter of credit.
Defendant next asserts that plaintiff did not have grounds to support the issuance of a temporary restraining order and thus, he is entitled to judicial interest, attorneys fees and costs. We disagree.
A temporary restraining order is properly granted when it appears from the facts shown by a verified petition or by supporting affidavit that immediate and irreparable injury, loss or damage will result to the applicant before the adverse party or his attorney can be heard in opposition. In the instant situation, it is clear that the partnership was insolvent and unable to pay its debts as they matured. As correctly stated by plaintiff in his appellate brief, "If the letter of credit had been honored by Calcasieu Marine National Bank, the plaintiff would have been relegated to an action for damages against the partnership. Since the partnership was insolvent and unable to pay its debts, the claim for damages would have been an inadequate remedy within the meaning of the law. This has been clearly shown in the facts of this case and, therefore, the damage would have been `irreparable' if the Temporary Restraining Order had not been issued by the trial court. Therefore, there was not an *1359 adequate remedy and the plaintiff was entitled to the temporary restraining order." If a judgment against appellant would be valueless either because of insolvency or other reasons, injunctive relief is proper. In the instant situation, such is the case. Accordingly, we find that the temporary restraining order was not improperly issued and deny appellant the requested damages.
In appellant's final assignment of error, it urges that the trial judge erred in admitting evidence of a compromise and settlement agreement in another proceeding and in admitting written hearsay evidence to the prejudice of the defendant. Even if we were to conclude that this evidence was improperly admitted, we find that the record still amply supports the trial judge's findings. As such, we will not disturb the trial court's findings on appeal.
Accordingly, for the reasons assigned, the judgment of the lower court is affirmed. All costs are assessed to defendants-appellants.
AFFIRMED.