PAUL A. BONIN, Judge.
h Despite years of public “listening” sessions sponsored by the New Orleans City Planning Commission and public hearings before the Commission, which resulted in a recommendation for a specified complete *610 overhaul of the City’s Comprehensive Zoning Ordinance, the City Council at the urging of Mayor Mitchell Landrieu substantively modified the Commission’s recommendation as it affected the distinctive Faubourg Marigny neighborhood. The neighborhood association and two of the residents of Faubourg Marigny joined in a suit to declare the adoption of the Mayor’s amendment, designated as MJL-6, invalid and to permanently enjoin its implementation. During the pendency of their suit, the plaintiffs and intervenor sought the issuance of a preliminary injunction to restrain the City “from issuing any permit or variance, [taking any action,] or authorizing in any way any activity,, under the terms of the new Section 18.13 of the City of New Orleans’ new Comprehensive Zoning Ordinance (“CZO”), contained within Amendment MJL-6 to Ordinance Calendar Number 30,367 (May 14,2015),” '
[¡¡Following a hearing on the request for the preliminary injunction, the district judge expressed dismay at the City Council’s tactics but concluded that he was bound to defer to its judgment in this matter. He thus denied the request for the issuance of a preliminary injunction. The unsuccessful parties appealed the judgment denying the request for a preliminary injunction of the judgment, which appeal is specially authorized by law. See La, C.C.P. arts. 1841, 2083 C, 3612 B.
Here, the parties principally focus their arguments on their disagreement about the plaintiffs’ likelihood of success on the merits of the declaratory judgment. Their primary disagreement is whether the City Council can amend a zoning ordinance without first referring the specific amendment to the City Planning Commission. We, however, in reviewing the denial of the request for a preliminary injunction under-an abuse-of-discretion standard, affirm the denial solely on the basis that the plaintiffs cannot show the requisite “imp-arable injury, loss, or damage”- which may result to them at this stage of the proceedings. See La. C.C.P. art. 3601'A (emphasis added).
We explain our decision below.
I
In this case, the Improvement Association[1] challenges the City’s attempt to place an overlay zoning district over the entirety of the Faubourg Marigny. One of this district’s features, to which the Improvement Association vehémently objects, provides that a developer who adheres to certain specified design criteria will [..¡automatically qualify for an increase in the base zoning district’s height, floor area ratio, and density restrictions. While our resolution of the Improvement Association’s appeal is straightforward, we first examine the context in which it arose. We set-the-stage for our disposition of this, and any subsequent related proceedings, by first describing the City’s attempt to effect a comprehensive rezoning of all immovable property within its jurisdiction, Following this, we describe this particular matter’s factual and procedural history.
A
According to Robert Rivers, the Executive Director of the City’s Planning Commission, it was apparent to many by 2010 that the City’s then-current CZO — which was drafted in 1965 — was “woefully out of date,” and “very difficult to use.” Accordingly, the process of drafting a new CZO began in 2010 with the passage of the *611 City’s Master Plan. Specifically, Section' 5-402 of the City’s Municipal Code tasks the Planning Commission with preparing a twenty-year Master- Plan, which -would consist “of a statement of development goals, objectives, and policies for the physical growth and development of the City, and shall include maps and' a text setting forth principles, standards, and proposals.” Section 5-502 further called upon the Planning Commission to commence work on a new CZO that was to be consistent with the new Master Plan.
The Planning Commission released its initial draft of the new CZO in September 2011. This draft, like all subsequent ones, grafted an overlay zoning ^district onto the Faubourg Marigny’s base zoning district. The Faubourg Marigny’s base zoning designation is HMMU, or Historic Marigny Mixed Use.
The CZO specifies that overlay zoning districts are created “for the purpose of requiring special controls in certain areas of the City that have .special characteristics or special development issues.” The intent of such a district “is to provide common controls over areas that require a specific type of zoning control but are typically zoned with more than one (1) base district.”
The purpose of the Riverfront Overlay District — the overlay district encompassing portions of the Faubourg Marigny — is “to preserve, create and enhance public views of and access to the Mississippi River and creatively encourage the use of and visual access to the riverfront by encouraging the development of a riverfront promenade, including connections to nearby public rights-of-way, open space and other public amenities.” This overlay district “establishes standards to guide a process to encourage new riverfront development to occur in a manner than minimizes substantial change to existing public views of ■the riverfront from adjacent public streets and neighborhoods, and enhances the existing riverfront promenade by encouraging a continuous public access along nonindustrial portions of the City’s riverfront between Jackson Street- and the Industrial Canal.”
The September 2011 version of the CZO defined the Riverfront Overlay District accordingly: “Esplanade Avenue to the Inner Harbor Navigation Canal, from the Mississippi River to Decatur Street/Charter Street (includes lots fronting lKon both sides of Decatur Street and the entire Hebert Naval facility at Poland Avenue).” The draft further provides numerous design standards touching upon general policy issues, protection of view corridors, the creation and maintenance of a riverfront promenade, and regulations governing development along the land-side of the flood-wall. The 2011 draft of the CZO also provided for the creation of riverfront gateways. The draft explains that “[e]er-tain nodal areas along the riverfront act as gateways to the riverfront and should improve the pedestrian environment through special design features.” The 2011 draft provided that the gateways were “to have effect in a two (2) block direction-from the identified access nodes at Elysian Fields Avenue, Press Street and Poland Avenue.” Significantly, a gateway area development that incorporates specified “superior design features” may qualify the site to an increase in the fifty-foot height limit up to seventy-five feet, “subject to .administrative site plan approval.” Following the release of the 2011 draft CZO, the Planning Commission held several public hearings in neighborhoods around the City, including one in the Faubourg Marigny which was attended by Improvement Association members.
The Planning Commission released a second draft of the CZO in September *612 2013. This draft left unchanged the definition of the Riverfront Overlay District, but altered the areas comprising the riverfront gateway: “Gateway areas are defined as the intersections of Poland Avenue, Ma-zant Street, Piety Street, and Press Streets with Chartres Street, and the intersection of Elysian Fields Avenue with North Peters Street. This does not apply to any property located within the | ^boundaries of the Vieux Carre.” Unlike the prior draft, the 2013 draft all but guaranteed that a development incorporating the specified superior design features would be entitled a twenty-five foot increase in the height limit beyond that of the base zoning district. As with the 2011 draft, the 2013 draft was subject to public hearings which were attended by members of the Improvement Association.
The Planning Commission released a third draft of the new CZO in July 2014, which changed the configuration of the Riverfront Overlay District: “The area bounded by Esplanade Avenue, a line extending from the centerline of Esplanade Avenue between North Peters Street and the center of the Mississippi River, the Mississippi River, the Inner Harbor Navigation Canal, a line extending from the centerline of Chartres Street between Poland Avenue and the center of the Inner Harbor Navigation Canal, Chartres Street, St. Ferdinand Street, and Decatur Street.” Similarly, the July 2014 draft also shrunk the area comprising the riverfront gateway: “Gateway areas are defined as the areas bounded by the floodwall along the Mississippi River, Chartres Street, Press Street, and Piety Street on the East Bank of the Mississippi River, and the area bounded by the levee along the Mississippi River, the Orleans Parish/Jefferson Parish boundary line, Brooklyn Avenue, Powder Street, and Alix Street.”
The City Council then passed motion M-14-314 on July 24, 2014, which formally asked the City Planning Commission for an analysis of, and recommendations regarding, the amendment of the entire CZO. The motion specifically directed the City Planning Commission and staff “to make any and all |7legal and appropriate changes and adjustments deemed necessary in light of public testimony resulting from this review.” The City Planning Commission then subjected the July 2014 draft to a series of formal public hearings which were attended by several members of the Improvement Association. In the wake of these hearings, the City Planning Commission again altered the terms of the Riverfront Overlay District as well as the gateway areas. The overlay district was now defined as:
The area bounded by Esplanade Avenue, a line extending from the centerline of Esplanade Avenue between North Peters Street and the center of the Mississippi River, the Mississippi River, the Inner Harbor Navigation Canal, a line extending from the centerline of Chartres Street between Poland Avenue and the center of the Inner Harbor Navigation Canal, Chartres Street, St. Ferdinand Street, Decatur Street, Elysian Fields Avenue, Chartres Street, the rear property line of lots with any frontage on Elysian Fields Avenue, Decatur Street, Frenchman Street, and Decatur Street.
This final draft, which the Commission amended and adopted and seemingly transmitted to the City Council, again shrunk the gateway area to where it now encompassed merely the areas bounded by “the floodwall along the Mississippi River, Chartres Street, Press Street, and Piety Street on the East Bank of the Mississippi River.” On the other hand, the final draft provided that a development that incorporates specified superior design elements *613 “qualifies” the project for an increase in the height and density limits otherwise applicable via the base zoning district.
. On March 16, 2015, the City Council publicly posted several so-called amendments to the CZO as recommended by the Commission, which amendments were proposed by Mayor Landrieu and later aggregated into an amendment |sdesignated MJL-6. Significantly, while MJL-6 left untouched the size and scope of the Riverfront Overlay District, it expanded the gateway area to where it was now coterminous with the overlay district. This abrupt change came as a great shock to many in the Improvement Association, as member Ray Kern testified:
They changed the Gateway to be the entire overlay. ... And basically we were just in a state of shock. We couldn’t believe where did this come from. And I understand it came from the Mayor’s office, but we don’t no [sic] where it came from. ... This was like everything we worked for. And you give the City Planning Commission some credit. They did scale back the Gateways to on part in the Bywater. We thought we had won some victory there ... we thought that our voices were heard, and that they scaled back. That Gateway to be, you know, at least it was a compromise, you know, we were happy about that. And then this comes along. It was just like wow.
And MJL-6 provided that for any property located within a gateway area, development proposals which incorporate the specified design “shall be entitled to”: “(i) an increase in the height limit up to two (2) stories, but no greater than twenty-five (25) feet beyond the height limit of the underlying zoning district, (ii) an increase of an additional 1.5 FAR [floor area ratio] above the maximum FAR permitted in the underlying zoning district, and (iii) the elimination of any Minimum Lot Area per dwelling unit requirement applicable in an underlying zoning district.”
On May 14,2015, the City Council entertained public comment on the new CZO. At the close of this session, the City Council adopted the new ordinance as amended by MJL-6. Those portions of the new ordinance defining and governing the new Riverfront Overlay District and gateway areas are now found at Section 18.13 of the City’s CZO.
According to its petition, the Improvement Association is a Louisiana nonprofit corporation with its principal place of business in New Orleans, Louisiana, the purpose of which is: “[t]o protect,’ maintain and support the Faubourg Marigny in the City of New Orleans and particularly that portion of it lying between the Mississippi River and St. Claude and between Esplanade Avenue and Press Street, ... [and] to promote the physical, cultural, architectural and historical values of said section and to secure adequate enforcement of all laws ... affecting same.” See, e.g., Cupit v. City of New Orleans ex rel. Bd. of Zoning Adjustments, 12-1708, pp. 4-6 (La.App. 4 Cir. 7/17/13), 120 So.3d 862, 864-866. In conjunction with its stated mission, the Improvement Association initiated thfe present matter by filing suit on May 28, 2015, against the City of New Orleans, the New Orleans City Council, and the New Orleans City Planning Commission seeking injunctive and declaratory relief. Specifically, the Improvement Association alleged that the City failed to refer that portion of its new CZO which is derived from ordinance amendment MJL-6 to the City Planning Commission for prior review-and-reeommendation process before adopting the amendment.
*614 The Improvement Association, accordingly, argued that the portion of the CZO attributable to MJL-6 is null and void, thus entitling it to a permanent injunction. Accordingly, and for the same reasons, the Improvement Association also sought a judgment declaring this same portion of the CZO to be null and void. Shortly thereafter,' the City answered the Improvement Association’s petition in hnwhich it denied its claims and requests for relief. And on August 5, 2015, Mr. Kern, a resident of New Orleans and a businessman who operates out of the Fau-bourg Marigny, filed a petition of intervention in which he adopted by reference the Improvement Association’s petition.
On August 10,. 2015 — shortly before the new CZO was set to take effect — the Improvement Association filed a motion for temporary- restraining order and preliminary injunction in which it sought to enjoin the City “from issuing any permit or variance, [taking any action,] or authorizing in any way any. activity, under the terms of the new Section 18.13 of the City of New Orleans’ new CZO, contained within Amendment MJL-6 to Ordinance Calendar Number 30,367 (May 14, 2015).”- The Improvement Association, therefore, was not asking the district court to block the new law from going into effect, but rather to prohibit the City from taking any action under the soon-to-be effective ordinance, The district judge denied the Improvement Association’s request for a temporary restraining order and a set show cause hearing,on its request for a preliminary injunction.
At the August 27, 2015 hearing, the parties introduced documentary evidence and testimony from several witnesses. Notably, the Improvement Association elicited testimony from three of its members — Mr. ' Kern, Brian Luckett, and Ms. Suarez — while the City offered testimony from Mr. Rivers. At the close of the hearing the district judge ruled in faVOl1 Of the City, and denied the Improvement Association’s request for a preliminary injunction:
I am not particularly fond of this particular ordinance, or this aspect of the ordinance, particularly MJL-6, to not allow the citizens | uof a neighborhood to have comment on things they’re going to have to live with is. abhorrent to me.
I think that it denigrates 010" entire system- of government when you don’t allow the citizens to have comment. And one side of me is fighting with that, while the other side of me knows that under the law that I can not supplant my judgment for that of the City Council or for another branch of government, unless it’s totally arbitrary and capricious. ■ ,
[[Image here]]
I am sorry, folks, but this is the province of the City Council. And I have-to deny the request for injunction.
The district judge, subsequently, signed a written judgment on September 4, 2015, denying the Improvement Association’s request for a preliminary injunction. The Improvement Association timely sought ■appellate review by way of a motion for devolutive appeal. See La. C.C. P. art. 3601 C (“An appeal from an order or judgment relating to a preliminary injunction must be taken, and any bond required must be furnished, within fifteen days from the date of the order or judgment.”).
II
On appeal, the Improvement Association argues that both state and.local law mandate that the City refer MJL-6 to the City Planning Commission, the City failed to adhere to this clear requirement, and the City’s failure to comport with the referral requirements renders that portion of the *615 CZO derived from MJL-6 null and void. The Improvement Association, therefore, does not so much assail the district judge’s denial of its request for a preliminary injunction — which sought to enjoin the City from issuing any permits in conjunction with MJL-6 — as it makes its case for a declaratory judgment on the grounds set out in its original petition, ie., that the statute is null and void ab initio. We, however, review the judgment actually haon appeal, which denied the Improvement Association’s request to enjoin the City from acting on the language of MJL-6 in the future. See Scarberry v. Entergy Corp., 13-0214, p. 14 (La.App. 4 Cir. 2/19/14), 136 So.3d 194, 206. Having reviewed the actual judgment, and ‘having requested supplemental briefing from the parties on the issue of “irreparable injury,” see Merrill v. Greyhound Lines, Inc., 10-2827, pp. 2-3 (La.4/29/11), 60 So.3d 600, 602-603, we conclude that the district judge did not abuse his discretion in denying the Improvement Association’s request for a preliminary injunction.
A
We begin by examining the statutory and jurisprudential law governing preliminary injunctions and the applicable standard of review. “A preliminary injunction is an interlocutory procedural device designed to preserve the status quo as it exists between the parties, pending trial on the merits.” Smith v. Brumfield, 13-1171, p. 6 (La.App. 4 Cir. 1/15/14), 133 So.3d 70, 74 (quoting Elysian Fields Church of Christ v. Dillon, 08-0989, p. 6 (La.App. 4 Cir. 3/18/09), 7 So.3d 1227, 1231). Injunctive relief is an equitable remedy, which is ordinarily only available when a party has no adequate legal remedy. Cf. West v. Town of Winnsboro, 252 La. 605, 211 So.2d 665, 670 (La.1967) (on rehearing) (“By adequate remedy at law is meant one which is as speedy, efficient, and complete as the remedy in equity.”). See also C. Napco, Inc. v. City of New Orleans, 06-0603, p. 6 (La.App. 4 Cir. 3/7/07), 955 So.2d 155, 160 (“Ah injunction is a harsh, drastic remedy that |1sshouId only issue where the petitioner is threatened with irreparable harm and has no adequate remedy at law.”).
A “court may hear an application for a preliminary injunction .-.. upon the verified pleadings or supporting affidavits, or may take proof as in ordinary cases.” La. C.C.P. art. 3609. “A preliminary injunction shall not issue unless notice is given to the adverse party and an opportunity had for a hearing.” La. C.C.P. art. 3602. Ordinarily, to prevail in the district court on a petition for preliminary injunction, the petitioner is required to establish by prima facie evidence that: 1) he will suffer irreparable injury, loss, or damage if the motion for preliminary injunction is not granted; and 2) he is entitled to a preliminary injunction through at least a showing that he will likely prevail on the merits of the case. See General Motors Acceptance Corp. v. Daniels, 377 So.2d 346, 348 (La.1979). See also Historic Restoration, Inc. v. RSUI Indem. Co., 06-1178, p. 11 (La.App. 4 Cir. 3/21/07), 955 So.2d 200, 208; La. C.C.P. art. 3601. The prima facie standard of proof to obtain a preliminary injunction is less than that required for a permanent injunction. See Smith) 13-1171 at p. 6, 133 So.3d at 74. “The principal demand for a permanent injunction, however, is determined on its merits only after a full trial under ordinary process, even though the hearing on the summary proceedings to obtain the .preliminary injunction may touch upon or tentatively decide merit-issues.”[2] Smith v. *616 West Virginia Oil & Gas Co., 373 So.2d 488, 494 (La.1979).
| m“A trial court has broad discretion in the granting or denial of a preliminary injunction, and will not be disturbed on review absent a clear abuse of that discretion.” Yokum v. Pat O’Brien’s Bar, Inc., 12-0217, p. 6 (La.App. 4 Cir. 8/15/12), 99 So.3d 74, 80 (citing Smith v. West Virginia Oil & Gas Co., 373 So.2d 488, 493 (La.1979)) (internal quotations omitted). “This broad standard is, of course, based upon the conclusion that the trial court committed no error of law and was not manifestly erroneous or clearly wrong in making a factual finding that was necessary to the proper exercise of its discretion.” Yokum, 12-0217 at p. 7, 99 So.3d at 80 (citing South East Auto Dealers Rental Ass’n, Inc. v. EZ Rent to Own, Inc., 07-0599, pp. 4-5 (La.App. 4 Cir. 2/27/08), 980 So.2d 89, 93). Absent a clear abuse of discretion, the denial of a preliminary injunction will not be overturned on appeal. See Oestreicher v. Hackett, 94-2573, p. 3 (La.App. 4 Cir. 5/16/95), 660 So.2d 29, 31.
B
We turn next to address the Improvement Association’s failure to establish that it will suffer irreparable harm in the absence of injunctive relief. Its argument on this point is twofold. It initially contends that it did not need to prove irreparable harm at trial because the City’s passage of that portion of the new CZO as amended by MJL-6 violated a prohibitory law. See Jurisich v. Jenkins, 99-0076, p. 4 (La.10/19/99), 749 So.2d 597, 599. The Improvement Association alternatively contends that even if the foregoing exception is inapplicable, it met its 11Kburden of proving irreparable harm through the allegations in its petition and the testimony of Ms. Suarez.
1
We address first the Improvement Association’s contention that it did not need to prove irreparable harm. Specifically, in Jurisich the Supreme Court established an exception to the irreparable harm requirement for instances when the plaintiff seeks a prohibitory injunction that seeks only to order compliance with a prohibitory law. The requisite showing of irreparable injury is dispensed with “when the conduct sought to be restrained is unconstitutional or unlawful, i.e., when the conduct sought to be enjoined constitutes a direct violation of a prohibitory law and/or a violation of a constitutional right.” Jurisich, 99-0076, p. 4, 749 So.2d at 599, citing to South Cent. Bell Tel. Co. v. Louisiana Pub. Serv. Comm’n, 555 So.2d 1370 (La.1990). Thus, under Jurisich, “[o]nce a plaintiff has made a prima facie showing that the conduct to be enjoined is repro-bated by law, the petitioner is entitled to injunctive relief without the necessity of showing that no other adequate legal remedy exists.” 99-0076, p. 4, 749 So.2d at 599.
This jurisprudential rule, however, requires three findings by the court before a plaintiff can circumvent the irreparable harm requirement: first, that the conduct that is sought to be enjoined violates a prohibitory law (whether an ordinance or a statute or the constitution); second, that the injunction seeks to 11firestrain conduct, not order it;[3] and *617 third, that the petitioner has met the low burden of making a prima facie showing that he is entitled to the relief sought. See Yokum, 12-0217, pp. 8-9, 99 So.3d at 81.[4]
This exception, however, is inapplicable to the Improvement Association’s request for a preliminary injunction. While the overall thrust of the Improvement Association’s legal argument is that the City Council is without lawful authority to adopt a zoning ordinance amendment the substance of which has not been first submitted for the required process'before' the Planning Commission, a position with which we agree (see our discussion in Part. Ill, post), it is clear that the Improvement Association did not seek to enjoin the City Council’s amendment of the new CZO,' which emerged with the Planning Commission, by its proposed or planned adoption. MJL-6.
In making its request, the Improvement Association sought not to block that portion of the CZO attributable to MJL-6 from taking effect, but rather to enjoin the City from issuing any permit, or “authorizing any activity,” under the terms of _JjjCZO Section 18.13, that portion of the' CZO attributable to MJL-6. Thus, while the Improvement Association makes an impassioned (and perhaps accurate) argument that the City’s enactment of Section 18.13 violated several procedural restrictions on the enactment of zoning regulations, the Improvement Association does not assert that the statute as applied by the City violates any prohibitory law.[5]
Because the Improvement Association’s actual request for injunctive relief does not seek to enjoin the'violation of a prohibitory law, it is not dispensed with the requirement of demonstrating, as we have discussed, that it will suffer irreparable' injury if preliminary injunctive relief does not issue.
2
We now turn to explain why the Improvement Association failed to establish through evidence and testimony that it will suffer irreparable harm.
In order to prove that irreparable harm will befall a party from the non-issuance of a preliminary injunction, the petitioning party must show that “money damages cannot adequately compensate for the injuries suffered and the injuries ‘cannot be measured by pecuniary *618 standards.’ ”[6] Histone Restoration, 06-1178 at p. 11, 955 So.2d at 208 (quoting Saunders v. Stafford, 05-0205, p. 6 (La.App. 4 Cir. 1/11/06), 928 So.2d 751, 754). “[M]ere inconvenience is not enough to show irreparable injury needed for the issuance of a preliminary injunction.” Hobbs v. Garman, 595 So.2d 1264, 1266 (La.App. 4th Cir.1992). Similarly, the proof of irreparable harm cannot be speculative or based upon some uncertain future event. See, e.g., A to Z Paper Co., Inc. v. Carlo Ditta, Inc., 98-1417, pp. 9-10 (La.App. 4 Cir. 9/9/98), 720 So.2d 703, 708, Rather, the condition to be enjoined must currently exist or be imminent. See 'id. An award of damages, not injunctive relief, is the traditional remedy for harm that does not involve irreparable injury. Id.
Here the Improvement Association alleged in its petition that any new development would affect its members’ quality of life because “new, large-scale developments would bring thousands of new residents, would cause parking problems, traffic congestion, noise, infrastructure overload, loss of privacy, and would affect other aspects of community charac-
ter.” Of course, even verified allegations asserted in a petition are not proof of that allegation. See, e.g., Louisiana Pac. Corp. v. Hyatt, 99-1420, p, 5 (La.App. 3 Cir. 3/1/00), 758 So.2d 295, 298.[7] At the hearing on its request for a preliminary injunction, the Improvement Association failed to offer any evidence in support of these allegations. ■ Rather, it presented testimony fi'om Ms. Suarez, who stated that Section 18.13’s overlay district and gateway areas abut .her property line. If a developer were to purchase this neighboring lot and take advantage of the gateway |19provisions, she testified, it would entitle them to construct next to her home a building that is eighty feet tall by eighty feet wide. Such.a building, according to Ms. Suarez, would result in a loss of sunlight to her home.[8] ■ Similarly, Ms. Suarez testified that future developments under Section 18.13 could possibly result in an increase in traffic and a concomitant decrease in the number of on-street parking spaces.
Clearly, the Improvement Association’s evidence was, at best, speculative and *619 hypothetical on the issue ■ of irreparable harm. Moreover, Ms. Suarez’s testimony touching on irreparable harm is entirely predicated upon the happening of a series of uncertain, future events; ■ i.&, a developer who elects to develop within the gateway area next door to Ms. Suarez in accordance with Section 18.13’s specified design standards. The Improvement Association; therefore, did not meet its burden of making a prima facie case that either it, or its members, would suffer irreparable loss in the absence of a preliminary injunction prohibiting the City from issuing permits in connection with Section 18.13.
-
We necessarily conclude, then, that the Improvement Association is not entitled to the issuance of a preliminary injunction as requested by it because it cannot show either that it will suffer irreparable harm or that it is- dispensed with the requirement of establishing irreparable harm. Thus, the denial of the issuance of the preliminary injunction as reqhested was legally correct. ' And the district judge did not abuse his discretion in denying the Improvement Association’s1 request. We thus affirm the ruling and remand the matter to the district court for ■ further proceedings on the principal demand seeking declarative relief along with the request for a permanent injunction.
Ill
Because we are remanding the matter to the district court, we deem it important to afford guidance to the district judge and the parties on the important, and perhaps dispositive, issue which has arisen in this case and oh which, the -parties principally litigated before the district judge. We have purposefully decided the merits of this appeal of an interlocutory ruling without reference to the legal, issue of whether the City Council could amend the new CZO, as recommended by the Planning Commission, without first referring MJL-6 to the Planning . Commission for its recommendation. We have avoided a resolution of this legal issue because the eviden-tiary record to date, especially as it relates to the formal proceedings before the Planning Commission, did not permit its resolution.
__[gjHere, the Improvement Association asserts that the district court erred because the applicable statutory law indicates clearly that' the City was obligated, yet failed,- to first refer MJL-6’s proposed changes to the CZO to the Planning Commission. The City, on the other hand, asserts that a pending zoning ordinance may be amended by the City Council without reference to the Planning Commission provided that the amendment is germane to the ordinance’s original purpose. See New Orleans Municipal. Code of Ordinances Section 3-112. Because the terms of MJL-6 were germane to the ordinance’s original purpose — a complete overhaul of the CZO — the City argues that the district court correctly .concluded that it was not obligated to first refer it to the Planning Commission before acting upon it.
A
Zoning is designed to foster improvements by confining certain classes of buildings and uses to certain localities without imposing undue hardship on property owners. See City of New Orleans v. Elms, 566 So.2d 626, 628 (La.1990). The essence of zoning “is territorial division in keeping with the character of the lands and structures and their peculiar suitability for particular uses, and the uniformity of use within the division.” Elms, 566 So.2d at 628. The traditional purpose of zoning is to reduce or eliminate the adverse effects of one type of land use on another by segregating different uses into *620 different zoning districts. See Phillips’ Bar & Rest., Inc. v. City of New Orleans, 12-1396, p. 11 (La.App. 4 Cir. 4/24/13), 116 So.3d 92, 100 (citing Redfearn v. Creppel, 455 So.2d 1356, 1359 (La.1984)).
And zoning, by its nature, is a legislative function. See Elms, 566 So.2d at 629. The authority to enact zoning regulations derives from the police power of a governing authority. See Palermo Land Co., Inc. v. Planning Com’n of Calcasieu Parish, 561 So.2d 482, 491 (La.1990). A presumption exists in law that an ordinance adopted by a legislative body in the exercise of its police power is valid. See Four States Realty, Inc. v. City of Baton Rouge, 309 So.2d 659, 664 (La.1974). It is, on the other hand, equally true that zoning laws are in derogation of the rights of private ownership. See City of Shreveport v. Curry, 357 So.2d 1078 (La.1978); Roberts v. Jefferson Parish Council, 235 So.2d 131 (La.App. 4th Cir.1970). As a result, we consistently require strict com pliance with the statutory procedures regulating enactment of zoning laws. See Schmitt v. City of New Orleans, 461 So.2d 574, 577 (La.App.4th Cir.1984). Failure to comply with such procedural restrictions, accordingly, is fatal to the validity of the zoning ordinance. Id. Although the jurisprudence instructs that doubtful cases are to be decided in favor of the validity of the zoning law, a district judge may nullify zoning legislation if it is shown “that the ordinance is clearly and palpably in contravention of the enabling act.” Jameson v. St. Tammany Parish Police Jury, 225 So.2d 720, 722 (La.App. 1st Cir.1969). The burden of proof, accordingly, is on the party “assailing the zoning ordinance.” Palermo, 561 So.2d at 489 n. 6.
_bB
As the local governing body with final zoning authority, the City of New Orleans has the authority to amend, supplement, change, modify or repeal existing zoning ordinances. See La. R.S. 33:106; La. R.S. 33:4725. Our examination of the statutory and jurisprudential law nevertheless indicates that before the City can amend its own CZO it must first present all such proposed changes to its Planning Commission for consideration and a recommendation. The procedural restrictions in this case are reflected within the Louisiana Constitution, the revised statutes, and ultimately the City’s own ordinances. In each instance, it is clear that the respective drafters intended for all zoning amendments to be adopted in conformity with orderly procedural restrictions providing uncontestably for review and comment from a planning commission.
1
Specifically, Section 17 of Article VI of the Louisiana Constitution grants local governing authorities the power to: “(1) adopt regulations for land use, zoning, and historic preservation, which authority is declared to be a public purpose; (2) create commissions and districts to implement those regulations; (3) review decisions of any such commission; and (4) adopt standards for use, construction, demolition, and modification of areas and structures.” These powers, nevertheless, must be exercised “[s]ubject to uniform procedures established by law.” La. Const, art. VI, § 17.
124SUCI1 uniform procedures are provided by the legislature in Title 33 of the Revised Statutes. Section 4721, of Title 33 of Louisiana’s Revised Statutes indicates that “the governing authority of all municipalities may regulate and restrict the height, number of stories, and size of structures, the percentage of lot that may be occupied, the size of yards, courts, and other open spaces, the density of population, and the *621 location -and use of the buildings, structures, and land for trade, industry, residence, or other purposes” in order to promote the “health, safety, morals, or the general welfare of the community.” In order to effectuate these purposes, a municipality’s governing authority is empowered “to divide the municipality into districts of such number, shape, and area as may be deemed .best suited to carry out the purposes; and within the districts so created, the governing authority may regulate and restrict the erection, construction, alteration, or use of buildings, structures or land.” La. R.S. 33:4722.
Such regulations, however, are to be made “in accordance with a comprehensive plan and designed to lessen congestion in the public streets, secure safety from fire, promote health and the general welfare, provide adequate light and air, avoid undue concentration of population, and facilitate adequate transportation, water supply, sewerage, schools, parks, and other public requirements.” La. R.S. 33:4723. Similarly, these regulations are to “be made with reasonable consideration of the character of the district and its peculiar suitability for particular uses, and with ,a view to conserving the values of buildings 12Sand encouraging the most appropriate use of land throughout the municipality.” La. R.S. 33:4723.
In order to avail itself of the powers conferred by the constitution and the revised statutes, and to aid it in the creation and modification of zoning regulations, “the legislative. body of the municipality shall appoint a zoning commission whose function it shall be to recommend the boundaries of the various original districts as well as the restrictions and regulations to be enforced therein, and any supplements, changes, or modifications thereof.” La. R.S. 33:4726 (emphasis added).[9] Before it makes any type of recommendation to a legislative body, a planning commission must first hold a public hearing, notice of which must be published at least three times. Id. Indeed, the revised statutes are clear that “[n]o regulations or restrictions shall become effective until after a public hearing at which parties in interest have an opportunity to be heard.” La. R.S. 33:4724.
Significantly, a municipality’s legislative body “shall not hold its public hearings or take action [on any recommendation] until it has received the final report of the zoning commission.” La. R.S. 33:4726 (emphasis added). The revised statutes, accordingly, provide clearly that a municipality cannot enact zoning legislation without first asking for its review by, and comment from, a Planning Commission. And the rules applicable to the enactment of zoning | ¡^procedures- apply with equal force to the amendment of. pre-existing zoning ordinances. See La. R.S. 33:4725.
Likewise, the City’s own ordinances support the proposition that it must first refer all zoning legislation to its Planning Commission before it can act upon it. See La. R.S. 33:4724 A (“The legislative body of a municipality which has provided for a comprehensive zoning plan shall provide for the manner in which the regulations and restrictions and the boundaries of the districts shall be determined, established, and *622 enforced 'and from time to time amended.”). Thus, Section 5-406(1) of New Orleans’ Municipal Code specifically provides that “the City Council shall refer all proposed zoning ordinances and amendments to the Commission for its recommendations.” In conformity ■ with the revised statutes, the Planning Commission shall hold a public hearing on the proposed ordinance, notice of which is to be published at least three times, “[p]rior to making recommendations on any zoning ordinance or amendment thereto, and prior to adopting regulations, governing subdivision of land.” See New Orleans Municipal Code of Ordinances Section 5-406(2). “In the case of amendments to the zoning ordinance, the Commission shall report its findings within a reasonable period of time, to be fixed by ordinance, without' a presumptive approval being granted.” See New Orleans Munich, pal Code of Ordinances Section 5-407.
Similarly, the City’s CZO also indicates that all changes to its zoning laws must first be referred to the Planning Commission before the City Council may act upon them. Section 16.2 first sets out that the City’s zoning ordinances may be |a7amended and that the procedures set out in the CZO “apply to all zoning text amendments,”, of which MJL-6 is undoubtedly one. Section 16.2.1 provides that the City Council may initiate a zoning text amendment by introduction of an ordinance or by adoption of a motion. Following public , notice, the proposed amendment is then referred to the Planning Commission, which is compelled to conduct a public hearing on the amendment and make recommendations to, the City Council. See New Orleans Comprehensive Zoning Ordinance Sections 16.2.3, 16.9.3, and 16.9.5. The Planning Commission is obligated to record the proceedings before it, and “the transcript of the proceedings, the minutes of the hearing, all applications, exhibits and papers submitted, all staff and advisory body or Commission reports and recommendations, and decisions and report(s) of the City Planning Commission shall constitute the record.” New Orleans Comprehensive Zoning Ordinance Section 16.9.3(3)(b). The Commission’s “written recommendations, if any, together with the staff report and recommendation, if any, shall be filed with the.Clerk of the City Council.” Id. Importantly for the purposes of remand, the City Council may only act upon anything “requiring a recommendation of the City Planning Commission” once it has received the Commission’s report. New Orleans Comprehensive Zoning Ordinance Section 16.9.6(2)(a).
The City’s own ordinances, therefore, provide clearly that all proposed zoning-related laws must first be referred to the Planning Commission before the City Council may act upon them. This is not to say, however, that the City, in its [^attempts to amend its own ordinances, is bound by the Planning Commissioner’s recommendations. Rather, in such a circumstance, the Planning Commission plays a procedurally mandated, yet advisory role. See Zoning and Land Use Controls, Ch; 38 Amendment of Ordinances and Maps, § 38.03[1] & [2] (LexisNexis Mather Bender 2015). Accordingly, the City may amend its CZO but only after the contents of -such an amendment have been reviewed by its Planning Commission.
2
The City argues, however, that subsection (3) of Section 3-112 of its Municipal Code affords the council the power to amend a pending zoning ordinance without first referring it to the Planning Commission provided that the amendment is germane to the ordinance’s original purpose. The subsection specifically provides: *623 “A proposed ordinance shall not be altered or amended during its consideration so as to nullify its original purpose or so as to accomplish an object not germane to its original purpose.” See New Orleans Municipal Code of Ordinances Section 3-112(3). This section, like the ones we have already examined, regulates the enactment of ordinances. Yet, it is also clear that Section 3-112(3) is of general scope and, as such, generally applicable to the enactment of all of the City’s legislation. Sections 4724 and 4725 of Title 33 of the revised statutes, Section 5-406(1) of the City Charter, and Section ■ 16.9.6 of the CZO, however, are'specific statutes addressing specifically the enactment of zoning-related legislation.
|2i)It is a hornbook rule of statutory construction that laws “on the same subject matter must be interpreted in reference to each other.” La. Civil Code. art. 13. Similarly, where two statutes deal with the same subject matter, they should be harmonized if possible, but if there is a conflict, the statute' specifically directed to the matter at issue must prevail as an exception to the statute more general in character. See Jackson v. M.R. Pittman, LLC, 08-0966, p. 12 (La.App. 4 Cir. 2/11/09), 5 So.3d 906, 914; Wallace C. Drennan, Inc. v. Sewerage & Water Bd. of New Orleans, 00-1146, p. 12 (La.App. 4 Cir. 10/3/01), 798 So.2d 1167, 1176. Having examined the applicable statutes and ordinances, we find that Section 3-112(3) neither supersedes nor obviates the very clear procedural restrictions embedded within sections 4724 and 4725 of Title 33 of the revised statutes, Section 5-406(1) of the Municipal Code, and Section 16.9.6 of the CZO. These zoning-related statutes and ordinances are the more specific provisions which take preference over, and supersede, the provisions of Section 3-112(3). This is not to say that Section 3-112(3) can play no role in analyzing future challenges to zoning legislation.. Rather, we conclude that Section 3-112(3)’s, “germaneness” requirement cannot be utilized to circumvent otherwise clear procedural restrictions on the City’s enactment of zoning legislation.
C
Here, the City was obligated by statute and ordinance to first refer MJL-6 to the Planning'Commission for consideration before it could be acted upon by the City Council if the substance of the amendment in' its scope and content had not |3flbeen previously acted upon' by the- Planning Commission. See La. R.S. 33:4724 and 33:4725, Section 5-406(1) of the Municipal Code, and Section 16.9.6 of the CZO. The City concedes that the MJL-6 itself was not first referred to the Planning Commission for its , review and action. But, our review of the proceedings before the district court indicate that while the parties provided the district judge with copies of the various draft CZO’s produced by the Planning Commission and a series of maps detailing the changing geographical scope of the overlay district and gateways, the evidentiary record is ambiguous such that we are unable to determine whether the Planning Commission ever formally considered the terms of MJL-6 during the CZO’s amendment process prior to the City Council’s vote on the amendment. The evidence adduced at the hearing on the request for preliminary injunction simply does not illuminate what proposals touching upon the overlay district and gateways actually were formally considered, and rejected, by the Planning Commission.[10]
*624 DECREE
We affirm the district court’s judgment of September 4, 2015, which denied the Faubourg Marigny Improvement Association, Inc.’s request for a preliminary injunction.
AFFIRMED

. For convenience, when we mention the Improvement Association, we include Lisa Suarez, who was added as a plaintiff in a supplemental petition, and Ray Kern, who later intervened,

. Where, however, "the parties have expressly agreed to submit the case for final decision at *616 the hearing on the rule for a preliminary injunction, the ruling on the preliminary injunction may definitively dispose of the merit issues.” See Smith, 373 So.2d at 494 n. 9. We can locate no such express agreement between the parties in the record before us.

. This is an important distinction. A petitioner is entitled to this exception only when the injunction sought is prohibitoiy, not mandatory. A prohibitory injunction is one that seeks to restrain conduct. See Jurisich, 99-0076, p. 4, 749 So.2d at 599. A mandatory injunction, *617 on the other hand, “commands the .doing of some action” and "cannot be issued without a hearing on the merits.” Concerned Citizens for Proper Planning, LLC v. Parish of Tangia-pahoa, 04-0270, p. 7 (La.App. 1 Cir. 3/24/05), 906 So.2d 660, 664.

. The jurisprudence also indicates that an ex-:- . ception to the requirement of showing irreparable injury exists in cases where the deprivation of a constitutional right is at issue. See Kruger v. Garden Dist. Ass’n, 00-1135, p. 6 (La.App. 4 Cir. 1/17/01), 779 So.2d 986, 990. Similarly, a claimant does need to prove the irreparable harm requirement when the purpose for the injunction is "to protect or restore possession of immovable property or of ■ a real right in immovable property of1 which he claims ownership, possession or enjoyment.” La. C.C.P. art. 3663; Jackson v. Pfeifer, 14-0062, p. 6 (La.App. 4 Cir. 11/12/14), 152 So.3d 998, 1002. In fact, when a defendant obstructs a plaintiff in the enjoyment of a real right, the latter may be entitled to a prohibitory injunction restraining the disturbance and also to a mandatory injunction for the removal of the obstruction or to undo what has been legally done. See Concerned Citizens, 040270, pp. 6-7, 906 So.2d at 664. None of these exceptions, however, are applicable to the Improvement Association’s request for injunctive relief.

. In fact, counsel for the City stated at oral argument that no developer has yet to signal an intent to take advantage of the gateway area's height or area allowances.

. If, however, a judgment would be valueless because of the judgment debtor’s insolvency "or other reasons,” injunctive relief is proper. Oestreicher, 94-2573, p. 4, 660 So.2d at 31 (citing Ciambotti v. Decatur-St. Louis, Lupin, Properties Ventures, 533 So.2d 1352, 1359 (La.App. 3d Cir.1988)). Such is not the case here,

. While it is true that thé Improvement Association’s petition was verified, such a petition can only have evidentiary effect in the context of preliminary injunction provided that a district judge first orders that the hearing on the request is to be tried solely upon affidavits. See La. C.C.P. art. 3609 ("The court may hear an application for a preliminary injunction or for the dissolution or modification of a temporary restraining order or a preliminary in-junction upon the verified pleadings or supporting affidavits, or may take proof as in ordinary cases, If the application is to be heard upon affidavits, the court shall so order in writing, and a copy of the order shall be served upon the defendant at the time the notice of hearing is served.”). The district judge issued no such order in this case,

.See, however, La. Civil Code art. 668:
Although one be not at liberty to make any work by which his neighbor’s buildings may be damaged, yet every one has the liberty of doing on his own ground whatsoever he pleases, although it should occasion some inconvenience to his neighbor.
Thus he who is not subject to any servitude originating from a particular agreement in that respect, may raise his house as high as he pleases, although by such elevation he should darken the lights of his neighbors's [neighbor’s] house, because this act occasions only an inconvenience, but not a real damage.

. Section 106 D of Tide 33’ of the Louisiana Revised Statutes clarifies that where a municipal “planning commission has been established under the authority of this Subpart, it shall also serve as a municipal zoning commission, and when acting as such, it shall hold separate meetings with separate minutes and records.” The City's Planning Commission is composed of nine members appointed by the Mayor with the approval of the City Council for staggered nine-year terms so that the term of one member expires each year. See New Orleans Municipal Code of Ordinances Section 5-401.

. It is true that the Executive Director of the Planning Commission when asked, whether MJL-6 added "anything to the Riverfront Gateway process thát had never been publicly *624 discussed or voted [on] including height bonuses, density bonuses, [and the] conditional use process,” answered, "[n]ot to my knowledge.” "Discussion” and "voted on,” however, do not have legal equivalency in this context.